

**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
Southern California

<u>VIA EMAIL & U.S. MAIL</u>

February 12, 2018

U.S. Department of Homeland Security
Privacy Office
245 Murray Drive SW, Building 410
STOP-0655
Washington, D.C. 20528-0655
E-mail: foia@hq.dhs.gov

U.S. Immigration and Customs Enforcement
800 North Capitol Street, N.W.
5th Floor, Suite 585
Washington, D.C. 20536-5009
E-mail: ice-foia@dhs.gov

Los Angeles Field Office
U.S. Immigration and Customs Enforcement
300 North Los Angeles St. Room 7631
Los Angeles, CA, 90012
E-mail: LosAngeles.Outreach@ice.dhs.gov

> **RE:   Request under the Freedom of Information Act**
> *Fee Waiver Requested*

Dear Sir or Madam:

This letter constitutes a request for records made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, on behalf of the ACLU of Southern California (hereinafter "Requestor").

Requestor seeks records concerning Immigration and Customs Enforcement ("ICE") agents' practice of misrepresenting or concealing their identity when conducting enforcement actions. In documented cases, ICE agents have mispresented themselves as local law enforcement agency officials, claimed that they were "police" investigating non-immigration related crimes, worn misleading uniforms, and engaged in other deceptive conduct to conceal their identity. Through the use of these tactics, commonly known as "ruses," ICE agents have attempted to gain an individual's consent to enter their home or other private property without a warrant.

Through this request, Requestor seeks to inform the public on a matter of great public concern— ICE's use of ruses and other deceptive tactics. These practices may violate federal law and the

Constitution, as well as applicable agency policies. They also undermine public safety. When community members cannot distinguish between local law enforcement officers and immigration agents, they may fear reporting crimes or cooperating as witnesses. Indeed, local law enforcement agencies, including the Los Angeles Police Department, have repeatedly affirmed that public safety is improved when immigrant community members can report crimes and assist in investigations without fear that doing so may lead to their deportation. *See, e.g.*, Peter Holley, "Defiant LAPD chief says department will refuse to help Donald Trump's deportation efforts," Washington Post (Nov. 15, 2016), *available at* https://www.washingtonpost.com/news/ post-nation/wp/2016/11/15/defiant-lapd-chief-says-department-will-refuse-to-help-donald-trumps-deportation- efforts/?utm_term=.356b6b7c6630 ("This is a population we police by creating partnerships, not by targeting them because of their immigration status.").

The public interest in the issue of ICE's use of ruses is reflected by the growing amount of media coverage and political interest in the topic. *See, e.g*., Alex Emslie, "S.F. Police Commissioners Want ICE Agents to Stop 'Impersonating' Police," KQED News (Jan. 18, 2018), *available at* https://ww2.kqed.org/news/2018/01/18/s-f-police-commissioners-want-ice-agents-to-stop-impersonating-police/; Jennifer Medina and Miriam Jordan, "A Broader Sweep," New York Times (July 21, 2017), *available at* https://www.nytimes.com/interactive/2017/07/21/us/ immigration-enforcement-california-trump.html (detailing ICE's use of fictitious story to gain consent to enter a home); Nicholas Rondinone and Vinny Vella, "Hartford Mayor: ICE Agents Were Misleading In Attempt to Detain Immigrant," Hartford Courant (Mar. 20, 2017), available at http://www.courant.com/breaking-news/hc-hartford-ice-0321-20170320-story.html; Sara Sanchez, "ICE 'ruses' have immigrant community on edge," El Paso Times (Mar. 4, 2017), *available at* http://www.elpasotimes.com/story/news/immigration/2017/03/04/ice-ruses-have-immigrant-community-edge/98320820/; Joel Rubin, "It's Legal for an immigration agent to pretend to be a police officer outside someone's door. But should it be?," LA Times (Feb. 21, 2017), *available at* http://www.latimes.com/local/lanow/la-me-immigration-deportation-ruses-20170219-story.html; Office of Congresswoman Nydia Velazquez, "Velazquez Seeks to Block Immigration Feds from Identifying as Local Police," Press Release (Apr. 6, 2017), *available at* https://velazquez.house.gov/media-center/press-releases/velazquez-seeks-block-immigration-feds-identifying-local-police; Jacqueline Stevens, "ICE Agents' Ruse Operations," The National (Dec. 18, 2009), *available at* https://www.thenation.com/article/ice-agents-ruse-operation/; Steven Greenhouse, "Immigration Sting Puts 2 U.S. Agencies at Odds," New York Times (July 16, 2005), *available at* http://www.nytimes.com/2005/07/16/politics/ immigration-sting-puts-2-us-agencies-at-odds.html. This widespread and growing media coverage and interest from public officials reflects the public's intense interest in ICE's use of ruse tactics in its enforcement practices.

Because these records concern a critical function of the government on a matter of significant public interest and concern, FOIA mandates their disclosure. *See* 5 U.S.C. § 552.

## REQUESTOR

The **ACLU of Southern California ("ACLU SoCal")** is a non-profit organization dedicated to defending and securing the rights granted by the U.S. Constitution and Bill of Rights. ACLU SoCal's work focuses on immigrants' rights, the First Amendment, equal protection, due



process, privacy, and furthering civil rights for disadvantaged groups. As part of its immigrants' rights work, ACLU SoCal monitors ICE enforcement practices. ACLU SoCal disseminates information to the public through its website and social media platforms, "Know Your Rights" documents, and other educational and informational materials. The ACLU SoCal regularly submits FOIA requests to DHS and other agencies—including, for example, on ICE's policies and practices for worksite immigration enforcement, and USCIS's policies and practices for the adjudication of naturalization applications—and publicizes the information it obtains through its website, newsletters and "Know Your Rights" presentations and materials.

**REQUEST**

We seek disclosure of any and all records[1] relating to or concerning[2]:

1. All policies, procedures, presentations, trainings, memoranda, directives, rules or other guidance concerning ICE agents'[3] use of ruses[4] or other tactics to conceal their identity, including but not limited to the following:
    a. Most recent version of the ICE Enforcement and Removal Operations Fugitive Operations Handbook;
    b. Most recent version of the Detention and Deportation Field Officer's Manual;

2. All policies, procedures, presentations, trainings, memoranda, directives, rules or other guidance concerning how ICE agents should identify themselves during enforcement actions;

---

[1] The term "records" as used herein includes, but is not limited to, all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audio tapes, faxes, files, e-mails, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, manuals, technical specifications, training manuals, or studies.

[2] The term "concerning" means referring to, describing, evidencing, commenting on, responding to, showing, analyzing, reflecting, or constituting.

[3] As used herein, the term "ICE agent" refers to any ICE agent, official, or other employee authorized to conduct enforcement actions, including arrests.

[4] As used herein, the term "ruse" refers to an ICE agent: (i) affirmatively misrepresenting herself as affiliated with a state or local law enforcement agency, other government agency or private entity; (ii) affirmatively misrepresenting the purpose for which the agent is seeking entry to a home or private property, or to communicate with an individual; (iii) wearing uniforms or clothing that suggests that the agent is affiliated with a state or local law enforcement agency, other government agency or private entity; or (iv) failing to identify herself as an ICE agent prior to seeking entry to a home or private property, communicating with an individual, or effecting an arrest.



ACLU
AMERICAN CIVIL LIBERTIES UNION
of SOUTHERN CALIFORNIA

LIBERTY | JUSTICE | EQUALITY

3. All policies, procedures, presentations, trainings, memoranda, directives, rules or other guidance concerning compliance with 8 C.F.R. § 287.8(c)(2)(iii) (requiring immigration officers executing an arrest to "[i]dentify himself or herself as an immigration officer who is authorized to execute an arrest" and "[s]tate that the person is under arrest and the reason for the arrest");

4. All policies, procedures, presentations, trainings, memoranda, directives, rules or other guidance concerning ICE agents' dress on duty, including their uniform, badges, insignias or other identifying marks;

5. All policies, procedures, presentations, trainings, memoranda, directives, rules or other guidance concerning the Fourth Amendment and search and seizure, including home entry, including but not limited to the following:
   a. "Regular Fourth Amendment training" provided to "ERO semi-annually," trainings given to agents "before any large scale operation," and "ongoing OPLA provided training." *See* AILA/ICE Liaison Meeting Minutes at 5 (Oct. 26, 2017 ) (attached hereto as Exhibit A);

6. All notices, reports, records, internal memoranda, or other documents regarding ruses conducted by ICE agents from the Los Angeles Field Office from January 1, 2013 to February 1, 2018, including but not limited to the following:
   a. All memorandum documenting ICE's attempts to obtain the permission of a "local agency head or the local chief of security of the private entity" prior to engaging in ruse, as required by the Memorandum from John P. Torres, "Addition to Section 5, Chapter 19 (Field Operations and Tactics) of the Detention and Deportation Field Officer's Manual (DDFM) – USE OF RUSES DURING ARREST OPERATIONS" (Aug. 15, 2005) (Exhibit B), Memorandum from John P. Torres, "Use of Ruses in Enforcement Operations" (Mar. 6, 2006) (Exhibit C), and Memorandum from Marcy M. Forman and John P. Torres, "Use of Ruses in ICE Enforcement Operations" (Aug. 22, 2006) (Exhibit D);
   b. Any records concerning permission given by an "affected entity," including a "local agency head or local chief of security of a private entity," concerning the use of a ruse by ICE agents (*see* Memorandum from John P. Torres, "Addition to Section 5, Chapter 19 (Field Operations and Tactics) of the Detention and Deportation Field Officer's Manual (DDFM) – USE OF RUSES DURING ARREST OPERATIONS" (Exhibit B));
   c. All records concerning "issues raised by the affected entity" and guidance provided by "the Deputy Assistant Director, in consultation with the Office of Principal Legal Advisor" concerning the use of a ruse, as required by Memorandum from John P. Torres, "Use of Ruses in Enforcement Operations," (Mar. 6, 2006) (Exhibit C);
   d. All records concerning the "use of a health or safety-based ruse," including the "pre-approv[al]" of the Assistant Secretary of ICE, as required by Memorandum from John P. Torres, "Use of Ruses in Enforcement Operations" (Mar. 6, 2006) (Exhibit C);



e.   Any records concerning enforcement operations in which a ruse tactic was employed, including any field operations worksheets submitted in connection with the operation and post-investigation reports;

f.   All videos depicting situations in which ICE agents employed ruse tactics;

g.   Any records concerning legal claims, complaints or letters received about the use of ruses from (i) other federal or local agencies; (ii) private entities; or (iii) affected individuals, and any responses provided by ICE;

7.   All records containing, describing, pertaining to, or referring to aggregate statistical reports or data regarding the use of ruses in enforcement operations;

8.   All press releases, statements, summaries or records of communications regarding ruses issued by ICE internally, between ICE and other federal and local agencies, or between ICE and other private entities such as the media; and

9.   Any reports, assessments or studies produced by the DHS Office of the Inspector General ("OIG") or other oversight entity regarding the use of ruses by ICE and any communications between the entity and ICE regarding the report, assessment or study.

Requestor asks that any records that exist in electronic form be provided in electronic format on a compact disc.

## LIMITATION OR WAIVER OF SEARCH AND REVIEW FEES

We request a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . educational or noncommercial scientific institution . . . or a representative of the news media") and 6 C.F.R. § 5.11(d)(1) (search fees shall not be charged to "representatives of the news media").

The information sought in this request is not sought for a commercial purpose. The Requestor is a non-profit organization that intends to disseminate the information gathered by this request to the public at no cost, including through the Requestor's website and social media. The ACLU SoCal regularly disseminates information to its members through action alerts, emails and newsletters (the ACLU SoCal has more than 28,000 members and, nationwide, the ACLU has more than 500,000 members). *See* http://www.aclusocal.org/about/. Requestor may also compile a report or other publication (such as Know Your Rights materials) on the government's use of ruses in enforcement operations based on information gathered through this FOIA. Requestor has repeatedly used information gathered through FOIA to disseminate information to the public through such forums. *See, e.g.*, http://www.aclu.org/immigrants-rights/immigrant-detainee-rights-are-routinely-systematically-violated-new-report-finds (ACLU SoCal report based on documents disclosed through FOIA). *See also* http://www.aclusocal.org/about/report-directory/ (compiling recent ACLU SoCal reports).

The term 'a representative of the news media' means "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw



materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii). The statutory definition does not require that the requestor be a member of the traditional media. As long as the requestor meets the definition in any aspect of its work, it qualifies for limitation of fees under this section of the statute.

Requestor qualifies as a "representative of the news media" under the statutory definition, because it routinely gathers information of interest to the public, uses editorial skills to turn it into distinct work, and distributes that work to the public. *See Electronic Privacy Information Center v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003) (non-profit organization that gathered information and published it in newsletters and otherwise for general distribution qualified as representative of news media for purpose of limiting fees). Courts have reaffirmed that non-profit requestors who are not traditional news media outlets can qualify as representatives of the new media for the purposes of the FOIA, including after the 2007 amendments to the FOIA. *See ACLU of Washington v. U.S. Dep't of Justice*, No. C09-0642RSL, 2011 WL 887731, at *18 (D. Wash. Mar. 10, 2011) (finding that the ACLU qualifies as a "representative of the news media"). *See also Cause of Action v. F.T.C.*, 799 F.3d 1108, 1125 (D.C. Cir. 2015) (observing that a "public interest advocacy organization" can qualify as a "representative of the news media"). Accordingly, any fees charged must be limited to duplication costs.

**WAIVER OR REDUCTION OF ALL COSTS**

We request a waiver or reduction of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester"); *see also* 6 C.F.R. § 5.11(k).

The public interest fee waiver provision "is to be liberally construed in favor of waivers for noncommercial requesters." *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th Cir. 1987). The Requestor need not demonstrate that the records would contain evidence of misconduct. Instead, the question is whether the requested information is likely to contribute significantly to public understanding of the operations or activities of the government, good or bad. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1314 (D.C. Cir. 2003).

Disclosure of the information and report sought is in the public interest and will contribute significantly to the public's understanding of ICE enforcement practices. The information sought will be critical to further inform the public whether such practices are in line with legal standards.

The requested records relate directly to the operations or activities of the government that potentially impact fundamental rights and freedoms. The records are not sought for commercial use, and the Requestor plans to disseminate the information disclosed through print and other media to the public at no cost. As demonstrated above, the Requestor has both the intent and ability to convey any information obtained through this request to the public.



The Requestor states "with reasonable specificity that [their] request pertains to operations of the government," and "the informative value of a request depends not on there being certainty of what the documents will reveal, but rather on the requesting party having explained with reasonable specificity how those documents would increase public knowledge of the functions of the government." *Citizens for Responsibility and Ethics in Washington v. U.S. Dept. of Health and Human Services*, 481 F. Supp. 2d 99, 107-109 (D.D.C. 2006).

In the event a waiver or reduction of costs is denied, please provide prior notice if the anticipated costs exceed $100.

**CONCLUSION**

We look forward to your reply to the records request within twenty (20) business days, as required under 5 U.S.C. § 552(a)(6)(A)(i). Please specify the search that was undertaken to locate records responsive to this request. If any responsive records are withheld in whole or part, we ask that you justify all withholdings by reference to specific exemptions of the FOIA and release all segregable portions of otherwise exempt material as required by FOIA.

Please contact Michael Kaufman at (213) 977-5232 with any questions. Please supply all records to:

Michael Kaufman
ACLU of Southern California
1313 West 8th Street
Los Angeles, CA 90017

Thank you for your prompt attention.

Sincerely,

Michael Kaufman
Senior Staff Attorney
ACLU of Southern California



# Exhibit A

## AILA/ICE Liaison Meeting Minutes
### October 26, 2017

Tracy Short, Principal Legal Advisor, OPLA
Michael Davis, Executive Deputy Principal Legal Advisor, OPLA
Mark Murphy, Associate Deputy Principal Legal Advisor, Field Legal Operations - West, OPLA
Joanna Hall, Special Counsel to the Executive Deputy Principal Legal Advisor, OPLA
Corey Price, Assistant Director, ERO
Adam V. Loiacono, Deputy Principal Legal Advisor, OPLA
Erin Clifford, Chief Government and Information Law Division
Heather Drabek Prendergast, Chair, AILA ICE Liaison Committee
Jesse Lloyd, Vice Chair, AILA ICE Liaison Committee
Sui Chung, AILA ICE Liaison Committee
Amanda Keaveny, AILA ICE Liaison Committee
Patrick Taurel, AILA ICE Liaison Committee
Maria Baldini, AILA ICE Liaison Committee
Aaron Hall, AILA ICE Liaison Committee
Cheryl David, AILA ICE Liaison Committee
Joseph Porta, AILA ICE Liaison Committee
Jennifer Minear, AILA Second Vice President
Laura Lynch, AILA Senior Liaison Associate
Katie Shepherd, AIC National Advocacy Counsel

## Staffing/Organizational Updates

1. Please provide an overview of any key staffing changes or other organizational updates that have been implemented since our last meeting on April 6, 2017.

   **The organizational chart on the ICE website has the most up to date information: www.ice.gov/leadership.**

## Prosecutorial Discretion

2. On approximately August 15, 2017, DHS General Counsel and ICE OPLA each issued guidance related to the exercise of prosecutorial discretion. This guidance implemented President Trump's January 25, 2017 Executive Order entitled *Enhancing Public Safety in the Interior of the United States*, and the February 20, 2017 DHS memorandum, *Enforcement of the Immigration Laws to Serve the National Interest*.

   a. AILA respectfully requests copies of this guidance that was issued to the field.

   **ICE OPLA will not provide this guidance to AILA. Acting General Counsel for DHS issued policy guidance to all DHS component legal programs regarding implementation of the Executive Orders.  The guidance extends beyond prosecutorial discretion issues and covers court proceedings as well as other aspects of program corps operations. The**

1

AILA Doc. No. 18011132. (Posted 1/11/18)

**Principal Legal Advisor also issued guidance to all OPLA attorneys. The guidance memoranda are for internal use only.**

    b.  Has ICE ERO also issued new guidance to the field related to the exercise of prosecutorial discretion?

**ERO did not issue its own guidance memorandum related to the exercise of prosecutorial discretion; it is operating under the Executive Orders and the DHS Secretary's memoranda.**

    c.  What criteria are considered when making prosecutorial discretion determinations under the new guidance?

**There are no delineated criteria for the exercise of prosecutorial discretion; Prosecutorial discretion is based on a review of the A file and other available information to determine whether prosecutorial discretion is merited based on the facts of the individual case. Prosecutorial discretion is exercised on a daily basis and used by attorneys at various stages of removal proceedings. For example, prosecutorial discretion can include not objecting to certain types of evidence, stipulating to facts, and deciding not to appeal.**

**On a case-by-case basis in extraordinary circumstances, the Chief Counsel may – *with the concurrence of the NTA issuing agency* (i.e. USCIS, CBP, ICE ERO or ICE HSI) – agree to administratively close or dismiss a case. The Chief Counsel's decision is final and that decision will not be reviewed by Headquarters. However, OPLA's role is to litigate cases where a legally sufficient NTA is presented. If the NTA is legally sufficient, OPLA will not administratively close a case without the consent of the agency that issued the NTA. If OPLA thinks a case is not legally sufficient, it will consult with the issuing agency regarding the defects. OPLA will not proceed with a legally insufficient NTA.**

**OPLA engages and coordinates with the Office of Immigration Litigation (OIL) on petitions for review in circuit court litigation.**

    d.  If requests for prosecutorial discretion were denied prior to the August 15th guidance, will ICE consider renewed prosecutorial discretion requests under the new criteria?

**Due to time constraints, this question was not asked.**

3.  Members report that ICE trial attorneys have been instructed to oppose all administrative closure requests based on pending applications or petitions with USCIS including Special Immigrant Juvenile (SIJ) filings, U visas, and UAC asylum applications. Instead, trial attorneys can only consider non-opposition to continuances. Does this accurately reflect national guidance that has been issued to the field from headquarters?

AILA Doc. No. 18011132. (Posted 1/11/18)

**The goal is to litigate cases to completion. Generally, OPLA attorneys should not administratively close cases where applications are pending with other agencies. OPLA attorneys have been instructed to use their discretion based on the merits of an individual case and may agree to continue a case when good cause is shown. Applications should be current.**

**EOIR has over 600,000 cases in its backlog. OPLA is working closely with EOIR on the backlog. As found by the Office of the Inspector General of the Department of Justice, excessive continuances and administrative closures have contributed to this backlog.**

4. Please confirm that the June 17, 2011 John Morton memo, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs* is still in effect.

   **As of January 8, 2018, this memorandum is still in effect, but all discretionary decisions must be made consistent with the President's Executive Orders and the Secretary's memoranda.**

5. AILA recognizes that joining in a motion to reopen is an exercise of prosecutorial discretion. Members in some jurisdictions report that OCC will no longer agree to join in motions to reopen, and in some instances, deny proposed joint motions within a week of receipt. What guidance has been issued to the field regarding review and consideration of joint motions to reopen?

   **Offices of Chief Counsel have been advised to use their discretion, based on the merits of each individual case to decide whether to join a motion to reopen. Joint motions are not a priority for OPLA to review. Given the finality of a final order, unless there are extraordinary circumstances, adding another case to the already backlogged docket is not a priority.**

## Guidance

6. Please confirm that the following memoranda remain in place: (1) the August 23, 2013, *11064.1: Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities*; (2) the August 15, 2016, *Identification and Monitoring of Pregnant Detainees*; and (3) the September 4, 2013 oversight of *Review of the Use of Segregation for ICE Detainees*.

   **As of January 8, 2018, the above listed memoranda are still in effect, but only to the extent they are consistent with the Executive Orders and Secretary's memoranda.**

7. AILA continues to receive reports that pregnant women in ICE custody are being detained for long periods of time in various detention facilities throughout the country. Many of these detained women are unable to obtain quality medical care and some of these women have suffered miscarriages while in custody. Has ICE issued any new policy guidance related to the detention of pregnant women in ICE custody?

3

**As of January 8, 2018, ICE has not issued new guidance as it relates to pregnant women.  When the decision to detain the individual is made in the field, ICE uses a high level of care to ensure that a person is getting proper medical care.  If there are extraordinary circumstances and the proper level of care cannot be provided, ICE will determine whether an alternative to detention, such as an order of supervision, may be appropriate.**

## U Visas

8. Please confirm that the September 25, 2009 guidance, *Guidance Regarding U Nonimmigrant Status (U Visa) Applicants in Removal Proceedings or with Final Orders of Deportation or Removal* remains in effect.

    **As of January 8, 2018, this memorandum remains in effect**, but only to the extent it is consistent with the Executive Orders and Secretary's memorandum.**

9. During our last liaison meeting, ICE discussed whether it was contemplating taking enforcement actions against individuals that are out of status but have a U visa application pending. ICE explained that if an individual encountered by ICE provides ICE with proof of a pending U visa, ICE counsel will seek a prima facie determination of the U visa from the Vermont Service Center (VSC), and then make a case-by-base determination.

    a. If the VSC is unable to issue a *prima facie* finding within five days as contemplated in the memo, please confirm that foreign nationals should nonetheless be permitted to remain in the United States pending a VSC decision.

    **When an individual has a pending U visa application, ICE contacts the VSC to determine whether there is a *prima facie* finding.  ICE indicated that the VSC typically provides a timely response.  If the VSC does not respond to ICE within 5 days, ICE will generally proceed with removal.**

    b. If VSC makes a *prima facie* finding, please confirm that the FOD should still "favorably view an alien's application for stay of removal" absent serious discretionary concerns.

    **All cases are reviewed on an individualized basis.  An OPLA attorney may provide legal analysis, but does not decide the stay.  All stay decisions are made by ERO.  When there is a *prima facie* finding and a negative decision on the stay at the local ERO office, ERO Headquarters reviews the stay denial before the individual is removed.**

## Enforcement Actions

10. ICE previously confirmed that it will not conduct enforcement operations at or near locations outlined in the *Enforcement Actions at or Focused on Sensitive Locations* memo, including demonstrations and rallies, without specific operational approval by ICE leadership. Does this policy remain in effect, even if the demonstration is near a federal building or location where ICE may have an office?

AILA Doc. No. 18011132. (Posted 1/11/18)

**As of January 8, 2018, this memorandum is still in effect; however, it is important to note that this is only applicable _AT_ the sensitive location – not merely near the sensitive location.**

11. Recent enforcement actions have given rise to complaints of 4th Amendment violations by ICE officers, including the use of impermissible tactics like entering homes without warrants or permission, obtaining permission by ruse, and detaining people on the basis of the individual's race or ethnicity. What 4th Amendment training is provided to ERO officers?  Is it regularly reviewed and updated?

**OPLA provides regular Fourth Amendment training to ERO semi-annually.   The training is regularly reviewed and updated.   OPLA Attorneys giving the training are designated to perform the training and training is consistent across the country.   Officers also receive training on Fourth Amendment issues before any large scale operation.   There is also ongoing OPLA provided training within offices, and local ERO offices can request and obtain additional Fourth Amendment training.    Fourth Amendment violations are taken very seriously by ICE.   Officers are expected to act professionally and are held accountable when violations occur.**

12. FAQs on ICE's website indicate that arrests of targeted individuals continue to be made at courthouses and explain that ICE views courthouse arrests as a good option in many cases both for safety reasons and as an efficient use of ICE ERO's resources. At the same time, some local law enforcement officers and court officials express concern that ICE arrests at courthouses tend to dissuade people from accessing courts and from seeking due process of law. In particular, California Supreme Court Chief Justice Cantil-Sakauye wrote to the U.S. Attorney General and the Secretary of Homeland Security to request that ICE refrain from enforcement activities in California courthouses. She noted that crime victims, victims of sexual abuse and domestic violence, and witnesses all need to be able to access courts to seek justice and due process and that enforcement actions at courthouses can "undermine the judiciary's ability to provide equal access to justice." Indeed, a 9/17/2017 media report from Denver cites city prosecutors having to drop charges on nine domestic violence cases after ICE courthouse activities were publicized because witnesses said they were afraid to appear in court.

   a.  Is there a national policy on which deportable individuals should be targeted at court appearances?

**There is no national policy on who to target.  The decision is made in the field.  ICE's preference is to take people into custody from the jail because it is safer for the public and the officers.  However, in some jurisdictions, local authorities refuse to cooperate with ICE in immigration enforcement, such as honoring detainers. Therefore, depending on the circumstances of the case, the best place to take a person into custody may be the courthouse, for public safety reasons.**

AILA Doc. No. 18011132. (Posted 1/11/18)

    b.  What criteria do ICE agents rely on when determining whether to arrest an individual at a court house?

**ICE does not tell its officers to only pursue specific types of cases or people. It is up to the discretion of the individual officers, but generally, ICE officers conduct targeted enforcement operations at courthouses against criminal aliens and other public safety threats. Enforcement actions at or near courthouses will, wherever practicable: (1) take place outside public areas of the courthouse; and (2) utilize the court building's non-public entrances and exits.**

## NTA Issuance

13. Do local OCC offices continue to participate in Notice to Appear (NTA) decisions with USCIS? Have new enforcement priorities changed the process or factors considered in the context of these NTA review decisions? If so, how?

    **Due to time constraints, this question was not asked. Please refer to the answer to Question 3.**

14. USCIS has indicated that its 2011 NTA guidance memo is under review. Is ICE working with USCIS on the revision of the NTA standards guidance? If so, when will the new guidance be released?

    **ICE is working with USCIS and defers to USCIS as to the status of the guidance**

# DACA

15. Since the creation of the DACA program, it has been DHS's policy that information included in a DACA application "is protected from disclosure" to ICE or CBP, except in very narrow circumstances. *See* USCIS DACA FAQs, Question #19. DHS recently articulated a different confidentiality policy in its FAQs released on September 5, 2017, stating "[i]nformation provided to USCIS in DACA requests *will not be proactively provided to ICE and CBP* for the purpose of immigration enforcement proceedings, unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance."[1] [Emphasis added.]

---

[1] ***"Q7: Once an individual's DACA expires, will their case be referred to ICE for enforcement purposes?*** A7: Information provided to USCIS in DACA requests will not be proactively provided to ICE and CBP for the purpose of immigration enforcement proceedings, unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter." (Last accessed September 26, 2017.)

AILA Doc. No. 18011132. (Posted 1/11/18)

a.  According to ICE, does the new policy permit ICE officers to request from USCIS information contained in DACA applications even if the requestor does not meet the criteria for the issuance of an NTA under USCIS's NTA guidance? If so, under what circumstances will ICE officers request such information?

**ICE declined to respond due to pending litigation.**

## Detention & Custody

16. Section J of the DHS border memo states that the Director of ICE and Commissioner of CBP "should take all necessary action and allocate all available resources to expand their detention capabilities at or near the border with Mexico…" Please provide an update on the status of ICE and CBP efforts to set up joint temporary structures.

**ICE has not had to stand up temporary facilities.**

17. Members report that ICE officers are requiring individuals to have an original passport in order to release an individual on parole following a successful credible fear interview (CFI) or to modify reporting requirements for a person in the Intensive Supervision Appearance Program (ISAP). This practice poses special problems for asylum-seekers who do not already have passports. It can endanger asylum-seekers, as well as their family and associates abroad, by alerting the very government they fear to their presence in the U.S. It can also potentially undermine asylum claims; page 23 of the Asylum Officer Basic Training Course, states that "possession of [a valid national passport] may be considered in evaluating whether the applicant is at reasonable risk of harm from the government, because it may be evidence that the government is not inclined to harm the applicant." Additionally, requiring asylum-seekers who have passed CFIs to furnish passports in order to be released on parole is inconsistent with ICE policy. *See* ICE Directive No. 11002.1, "Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture," at 6 (Dec. 8, 2009) (instructing ICE Field Office personnel to review "*all relevant documentation* offered by the alien, as well as any other information available about the alien, to determine whether the alien can reasonably establish his or her identity") (emphasis added); *see also* ICE Form 71-012, Parole Advisal and Scheduling Notification (indicating that asylum-seekers are not required to provide ICE with original passports in order to establish their identity).

a.  In addition to passports, what other identity documents will ICE accept from asylum-seekers in order to modify reporting requirements for individuals on ISAP or to release individuals on parole?

**Due to time constraints, this question was not asked.**

18. AILA has received reports that indicate an increase in cases where individuals remain in detention beyond 180 days following issuance of a removal order. Please provide statistics on the number of post-order cases where custody has exceeded 180 days.

**AILA Doc. No. 18011132. (Posted 1/11/18)**

**ICE declined to provide statistics on the number of post-order cases where custody has exceeded 180 days.**

19. Given the focus on expanded detention, AILA requests the following information:

    a.  A list of any new contracts and renewed or modified contracts that ICE has entered into with detention facilities since January 1, 2017.

**Below is a list of new ICE contract agreements to utilize detention facilities since January 1, 2017:**

**JOHNSON COUNTY CORRECTIONS CENTER
OKMULGEE COUNTY JAIL
YANKTON COUNTY JAIL
NORFOLK CITY JAIL
BREMER COUNTY JAIL
ANNE ARUNDEL COUNTY ORDNANCE ROAD CORRECTIONAL CTR
RENSSELAER COUNTY CORRECTIONAL FACILITY**

    b.  A list of all of ICE's facilities that are only authorized to hold detainees for under 72 hours.

**ICE declined to provide this information.**

    c.  A list of all facilities where ICE holds mentally ill/incompetent persons, as well as any associated treatment facilities where ICE may send an individual for further care.

**There is not a designated list of facilities where detainees who need mental health services are sent.  ICE considers the medical needs of each individual.  Some facilities have care on site, some off site, and some have tele-health.  With respect to letting attorneys know where their clients are, ICE expects its officers to be professional and respond to inquiries.**

    d.  A list of ICE officer contact information for all ICE facilities. Please include a telephone number, email address, and fax and if possible.

**ICE declined to provide this information, and recommended contacting the Assistant Field Office Director (AFOD) in charge of the facility.**

    e.  A list of all detention facilities that ICE is currently utilizing. Please specify the "type" of detention facility, date of contract, and indicate which detention standards govern each facility (i.e. 2000 National Detention Standards, Family Residential Standards, 2008 Performance-Based National Detention Standards (PBNDS 2008), 2011 Performance-Based National Detention Standards (PBNDS 2011), or Revisions to the 2011 Performance-Based National Detention Standards.

AILA Doc. No. 18011132. (Posted 1/11/18)

**ICE declined to provide this information.**

20. AILA members have raised concerns about the impediments to visiting, communicating with, and/or seeking information necessary to represent individuals who are detained in ICE custody. Attorneys report that numerous facilities lack meeting space where attorneys can meet with clients and maintain confidentiality, and have overly restrictive visitation hours and other burdensome rules and procedures. What policies are in place to ensure that all ICE detention facilities provide adequate attorney visitation hours, as well as adequate meeting space that preserves attorney/client confidentiality but do not require hours of waiting to access?

**The ICE detention standards govern. They require facilities to provide a private place for attorneys to meet with clients 7 days a week, 8 hours per day on weekdays, and 4 hours per day on holidays and weekends. If an officer has to be able to see a detainee to maintain security, the attorney's ability to meet with a detainee and speak privately is still expected. There is no requirement for a minimum number of attorney visitation spaces. Attorneys experiencing barriers in accessing detained clients should raise these concerns with local ICE ERO leadership. If local ICE leadership is unable to resolve the detention issues, AILA members should email ICE Headquarters at <u>detention.legalaccess@ice.dhs.gov</u>.**

21. Is ICE still utilizing the Risk Classification Assessment (RCA) tool to help officers determine whether to detain or release noncitizens? Have there been any changes to the RCA criteria to make custody determinations?

**Yes, ICE is still using the RCA tool to assist with custody determinations, but supervisors still make the decisions. ICE has made changes to the RCA during summer 2017 to better align with the Administration's Executive Orders.**

## I-246 Application for Stay of Removal

22. Members report that some ERO officers actively discourage attorneys and *pro se* respondents from submitting Form I-246 Applications for Stays of Removal by saying that the I-246 application will be summarily denied and the application will serve to expedite the individual's removal from the U.S. Has new guidance been issued to the field regarding adjudication of I-246 applications?

**No new guidance has been issued. ICE tries to provide timely adjudications as much as possible, but the decision on whether to proceed with removal is ultimately up to the Field Office Director (FOD). If a stay request comes in, that stay request will not necessarily stop the scheduled removal. If there are factors that are extraordinary or new (such as an expunged criminal conviction) then ICE should be notified. The decision to grant or deny a stay is a discretionary decision ultimately made by the FOD.**

AILA Doc. No. 18011132. (Posted 1/11/18)

**Stays are meant to be temporary in nature. There are individuals who have relied on indefinite stays to remain in the U.S. for many years. ICE will no longer approve stay applications year after year. Individuals must make arrangements to depart.**

**Stay applications are reviewed on a case-by-case basis. There should not be summary denials. If an officer refuses to accept a stay application, or says it will be denied, this should be elevated to the AFOD or Deputy Field Office Director (DFOD). There is a difference between rejecting a stay and saying a stay most likely will not be approved.**

23. During the October 19, 2015 liaison meeting, ICE stated that "last minute stays should be adjudicated and the decision should be provided to the attorney before a removal is executed." ICE specified that FODs should communicate the decision directly with the attorney before removal. AILA continues to hear from members whose clients are removed before a decision on the I-246 Application for Stay of Removal is issued or provided to the attorney. What guidance has been provided to the field regarding the provision of notice of a decision to counsel?

**Notification of the stay decision is considered best practice. ICE makes attempts, but it cannot promise notification in every instance. When removal is imminent, it may not be possible for ICE to contact the attorney with the decision before the removal is executed.**

## Post Order Issues

24. AILA's members have reported deteriorating physical conditions at ERO check-in facilities. In some jurisdictions individuals must wait in long lines in the hot sun. One attorney described a man fainting and becoming physically ill. Young children are also outside in the elements. We recognize that the facilities were likely leased before various initiatives increased the volume of work and visitors to the offices. What, if anything, is ICE doing to alleviate standing in line for hours, often outside, and very limited space in the waiting rooms?

**Due to time constraints, this question was not asked.**

25. For years, many individuals with final orders of removal have consistently reported to ICE ERO on Orders of Supervision (OSUP) without incident. As long as these individuals complied with ICE ERO reporting requirements, they were permitted to obtain work authorization from USCIS and continue to live and work in the U.S. However, under the new enforcement priorities, many of these individuals are suddenly being detained when they report to ERO without an opportunity to purchase a plane ticket to depart the U.S. These individuals almost always have countless positive equities, including being married to U.S. citizens and having U.S. citizen children, and some have compelling humanitarian situations that have kept them in the U.S. Please explain how these enforcement actions fit into ICE's enforcement priorities.

10

**Placing an individual on an OSUP is an act of discretion in and of itself.  When an individual on an OSUP reports, he or she may be taken into custody, depending on case circumstances (e.g. obtained travel document, criminal act committed, etc.).  The decision to detain is made on a case-by-case basis.**

**The "ideal" situation is when the individual buys his or her own ticket and self-deports so attorneys or respondents are encouraged to start the discussion with the field office about travel arrangements in advance of the report date and present the option of self-deportation.**

26. On January 3, 2013, Secretary Napolitano announced a final rule permitting provisional waivers for individuals subject to the unlawful presence bars under INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). *See* 78 Fed. Reg. 535. The rule was promulgated to reduce the time that U.S. citizens are separated from their immediate relatives, thereby reducing the financial and emotional hardship for these families. The final rule further stated that as a result of this new rule, the Federal Government should achieve increased efficiencies in processing immigrant visas for individuals subject to the unlawful presence inadmissibility bars.

On July 29, 2016, USCIS published a final rule in the Federal Register expanding the provisional waiver program, effective August 29, 2016. *See* 81 Fed. Reg. 50, 244. Pursuant to 8 C.F.R. §212.7(e)(4)(iv), individuals with a final order can seek a provisional waiver if they have previously obtained permission to reapply for admission through an approved Form I-212 under 8 C.F.R. §212.2(j). The individuals can only proceed with the I-601A application for provisional waiver as long as an I-212 has been conditionally approved. Comments in the regulation state that expanding provisional waivers to those with conditionally approved I-212 waivers is keeping within the goals of the provisional waiver process and supported by making them available to those with final orders of removal. *See* 81 Fed. Reg. at 50256, 50259, and 50262.

These regulations therefore explicitly anticipate applicants with final orders of removal to remain in the United States while their waiver applications are pending.  Moreover, detaining individuals pending resolution of their waiver applications is against the interests of all involved.  Nonetheless, we understand ICE is detaining individuals who are eligible for these waivers.  IN many instances, these individuals have been reporting to ICE for years, have been on orders of supervision and are in the middle of the waiver process.  Does ICE factor the pendency of I-212 or I-601A waiver applications in the enforcement decisions for those with final orders?  What is ICE's rationale for detaining individuals who are eligible for a conditional I-212 and I-601A waiver?

**Due to time constraints, this question was not asked.**

## Humanitarian

27. ICE has provided a nationwide mailing address for humanitarian parole requests, but no other contact information. During the December 1, 2016 ICE Liaison meeting, ICE indicated that

AILA Doc. No. 18011132. (Posted 1/11/18)

attorneys should submit follow up inquiries for humanitarian parole requests to ICE in writing. Has this procedure been updated? If so, please provide the updated procedures.

**There has not been a change in procedure. Inquiries must be submitted in writing to the nationwide mailing address.**

28. Many families lost everything in the flooding and destruction caused by Hurricanes Harvey and Irma. What steps is ICE taking to ensure that individuals impacted by storms and other disasters are not prejudiced by the loss of important documents?

**ICE is not aware of any systematic problems. There is no broad policy. On an individual case-by-case basis, ICE will take appropriate actions depending on the circumstances presented.**

## Records Retention

29. In July, the National Archives and Records Administration (NARA) published a request made by ICE to begin destroying detainee records, including those related to in-custody deaths, sexual assault, and the use of solitary confinement. AILA, along with other organizations, submitted comments raising the concern that the eradication of such records will make it more difficult to monitor conditions inside immigration detention facilities, which are often owned and operated by private prison companies that have contracts with the federal government, and do not have uniform detention standards. Does ICE have an update on this initiative?

**Pursuant to the Federal Records Act, all federal records, in all formats, must be scheduled, and all schedules must be approved by NARA. Federal records fall under two types of records schedules: General Records Schedules (GRS) and agency-specific schedules. Because ICE is a relatively new agency, formed in 2003, ICE does not have NARA approved agency-specific schedules covering all categories of records. If agency records are not on a NARA approved records schedule they cannot be destroyed or transferred to NARA as required by federal law. ICE has been working with NARA to establish records retention schedules in order to come into alignment with federal records management laws and regulations. The ICE proposed schedules being considered by NARA are routine government record maintenance as prescribed by federal law and NARA.**

**The proposed ICE records schedules were published in the Federal Register on July 14, 2017. The 30-day comment period ended on August 14, 2017. The last individual comment period for multiple requesters ended on September 15, 2017. NARA is currently in the process of adjudicating the comments.**

## Termination for USCIS Adjudication

12

30. After an immigration judge terminates proceedings in order for a respondent to pursue adjustment of status before USCIS, OCC must send this notice and documentation to USCIS. Members have reported that OCC does not always send this information to USCIS, even after attorneys have submitted numerous requests. Unfortunately, USCIS cannot proceed with adjudication until they have received this documentation from OCC. This issue causes significant case processing delays.

    a.  What is the policy or guidance for OCC to provide notice to USCIS after termination of proceedings where the foreign national will adjust before USCIS?

**Due to time constraints, this question was not asked.**

    b.  What is the best procedure that attorneys should follow in order to follow up with OCC about this issue?

**Due to time constraints, this question was not asked.**

13

# Exhibit B

*Office of Detention and Removal Operations*
*U.S. Department of Homeland Security*
*425 I Street, NW*
*Washington, DC 20536*



**U.S. Immigration
and Customs
Enforcement**

AUG 1 5 2005

MEMORANDUM FOR:     All Field Office Directors
                    ICE Academy

FROM:               John P. Torres
                    Acting Director

SUBJECT:            Addition to Section 5, Chapter 19 (Field Operations and Tactics)
                    of the Detention and Deportation Officer's Field Manual
                    (DDFM) – **Use of Ruses During Arrest Operations**

<u>Purpose</u>

This memorandum announces an immediate addition to Section 5, Chapter 19 of the DDFM.

<u>Action</u>

Field Office Directors will ensure that all personnel who conduct enforcement operations
within their area of responsibility are aware of this addition. The ICE Academy will ensure
that future students of the Fugitive Operations Training Program (FOTP) as well as all other
DRO structured courses are made aware of this addition. A revised Section 5 will be issued in
the near future.

This addition will be inserted in paragraph V. (Arrest Locations) just before the section labeled
'**Fugitives Encountered in Vehicles**':

### Use of Ruses During Arrest Operations

The USMS, FBI and various other federal, state and local agencies have successfully
used '*ruses*' to lure targets to locations where the arrests were made with the least
amount of danger to both the officers and targets. The use of a ruse during an arrest
means that we control the time and location, not the target. The use of ruses is taught
in the FOTP at FLETC.

Ruses can run the gamut from announcing that you are with DRO and looking for a
person other than the target to adopting the guise of another agency (federal, state or
local) or that of a private entity. When using the name of another agency or that of a
private entity to cover the operation, the Team Leader will contact that agency or
entity. The initial point of contact with the proposed cover agency or entity should be
the local agency head or the local chief of security of the private entity. A
memorandum to the file should be prepared to document these discussions.

www.ice.gov

SUBJECT:  Addition to Section 5, Chapter 19 of the DDFM
Page 2

The purpose of the contact is to ensure that the agency or entity's name who we wish
to use as a cover has an opportunity to raise concerns about how our use of their
name will affect their public image or raise security concerns for their employees.
Private entities can be particularly sensitive to the use of their name in law
enforcement operations.

If the affected agency or entity has concerns with the use of the ruse, contact the
Headquarters Fugitive Operations Unit. The HQ/FOU will weigh the affected agency or
entity's equities and concerns against the well-known and inherent advantages that a
ruse offers.  It is our intention to use whatever means available to ensure that officer,
target and innocent third party safety is not compromised.

Any questions regarding this policy should be directed to (b)(6),(b)(7)(C)  Chief,
Headquarters Fugitive Operations Unit at (202)353 (b)(6)

# Exhibit C

*Office of Detention and Removal Operations*

U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

MAR – 6 2006

MEMORANDUM FOR:     Headquarters Divisions
                    All Field Office Directors

FROM:               John P. Torres
                    Acting Director

SUBJECT:            Use of Ruses in Enforcement Operations

Purpose

This memorandum serves to provide additional guidance originally issued on August 15, 2005,
regarding the use of ruses during arrest operations. This memorandum, with forthcoming
updated policy directive, applies to all Detention and Removal enforcement operations. The
use of ruses in the performance of U.S. Immigration and Customs Enforcement (ICE) law
enforcement mission remains a valuable and effective tool. Ruses are used by virtually every
law enforcement agency in the federal government. One of the main objectives of the ruse is to
prevent violators from fleeing, thereby allowing for a safe arrest that does not place the
violator, the arresting officer or innocent bystanders at risk.

Discussion

The use of a ruse during an arrest involves controlling the time and location of the encounter as
dictated by ICE officers. Ruses may involve impersonating employment with other federal,
state, local, or private entities. As outlined in the original guidance, it is still incumbent upon
the arresting officers to provide prior notice to the affected entity. This notice affords the
affected entity the opportunity to raise concerns regarding the affect the ruse may have on their
security or public image. The point of contact with the proposed cover entity shall be the
appropriate agency head authorized for giving concurrence. A memorandum to the file shall be
prepared to document these discussions.

Any issues raised by the affected entity shall be forwarded within two working days to the
appropriate Headquarters' Deputy Assistant Director. The Deputy Assistant Director, in
consultation with the Office of Principal Legal Advisor, will consider the issues and provide
guidance as appropriate.

In particular, ICE Headquarters has directed that the use of ruses involving *health and safety*
programs administered by a private entity or a federal, state, or local government agency, such
as Occupational Safety and Health Administration (OSHA), will be discontinued. All other
ICE investigative enforcement actions requiring the use of a health or safety-based ruse must

www.ice.gov

Subject: Use of ruse in Enforcement Operations
Page 2

be pre-approved by the Assistant Secretary of ICE and coordinated with the respective
government agency or private entity.

Should you have any questions regarding this issue, please contact the Assistant Director for
Operations or Chief of Staff at 202-305-[ (b)(7) ]
[ (C)(b) ]

# Exhibit D



U.S. Department of Homeland Security
425 I Street, NW
Washington, DC  20536

**U.S. Immigration
and Customs
Enforcement**

AUG 2 2 2006

MEMORANDUM FOR:   All Special Agents in Charge
                                    All ICE Attachés
                                    All Field Office Directors

FROM:                        Marcy M. Forman
                                    Director, Office of Investigations

                                    John P. Torres
                                    Acting Director, Detention and Removal Operations

SUBJECT:                  Use of Ruses in ICE Enforcement Operations

This memorandum serves as joint guidance on the use of ruses in criminal investigations and law enforcement operations.  The use of ruses in law enforcement operations is an effective law enforcement tool that enhances officer safety.  One main objective of a ruse is to prevent violators from fleeing and placing themselves, officers and innocent bystanders in a potentially dangerous situation.

However, the use of ruses utilizing the names of agencies and companies involved in the administration of health and safety programs can impede the functions of those organizations by creating a perception that these organizations are acting as an enforcement tool of ICE.  The use of ruses involving health and safety programs undermines the efforts to increase safety in the workplace and undercuts workers willingness to report workplace safety violations based on a fear of law enforcement action being initiated against the reporting worker.

Pursuant to memorandums dated March 6, 2006, subject Use of Ruses in Enforcement Operations, the Offices of Investigations and Detention and Removal Operations discontinued the use of ruses involving health and safety programs administered by a private entity or a federal, state, or local government agency, such as the Occupational Safety and Health Administration (OSHA), for the purpose of immigration worksite enforcement.  The cited memorandums require Assistant Secretary pre-approval of all other investigative enforcement actions requiring the use of a health or safety-based ruse, as well as appropriate coordination with the respective government agency or private entity.

This jointly issued memorandum reinforces the prohibitions and approval requirements outlined in the March 6, 2006, memorandums.

Questions on this matter from OI offices should be directed to Acting Deputy Assistant Director (b)(6),(b)(7)(C) at (202) 305 (b)(6) and from DRO offices to Deputy Assistant Director (b)(6),(b)(7)(C) at (202) 616 (b)(6),(b)(7)(C)